**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

—————————————————————
**ARELI VEGA REYNA et al.**                           )
                                                                        )
              *Plaintiffs*                                     )
       **v.**                                                      )          **Civ. No.: 1:17-cv-01192-LO-TCB**
                                                                        )
**RUSSELL HOTT et al.**                                )
                                                                        )
              *Defendants/Respondents*.           )
—————————————————————)

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Macario Diaz

Morales ("Mr. Diaz Morales"), J.F.G., K.G., J.D.V., J.D.V., individually and on behalf of all

others similarly situated (collectively, "Plaintiffs"), submit this Memorandum of Law in Support

of their Motion for Class Certification and state as follows:

Plaintiffs propose, and seek certification of two classes, consisting of:

(1) All parents of U.S. citizen children residing in the Commonwealth of Virginia, who at
     any time on or after October 20, 2017 are or were detained by U.S. Immigration and
     Customs Enforcement within the Commonwealth of Virginia under the authority of 8
     U.S.C. § 1226; and

(2) All U.S. citizen children residing in the Commonwealth of Virginia who, at any time
     on or after October 20, 2017, have a parent detained within the Commonwealth of
     Virginia by U.S. Immigration and Customs Enforcement under the authority of 8
     U.S.C. § 1226.

Plaintiffs furthermore request that the Legal Aid Justice Center be appointed class

counsel for both classes.

**I.        Introduction**

The plaintiff classes are represented by named plaintiff Macario Diaz Morales ("Mr. Diaz

Morales"), and his four minor U.S. citizen children, J.F.G., K.G., J.D.V., and J.D.V., by their

next friend and mother Areli Vega Reyna ("Ms. Vega Reyna"). Mr. Diaz Morales, Ms. Vega Reyna, and their children live in Alexandria, Virginia. Prior to his detention, Mr. Diaz Morales spent most of his free time with his family, going on family walks in nature preserves, playing soccer as a family, going out to eat together, and indulging his children with ice cream from the ice cream truck. Together with his wife, 18-year-old stepdaughter, two stepchildren, and two biological children, they formed a tight-knit family of seven. Mr. Diaz Morales loved all five of his children as his own, and they in turn view him as their father.

Mr. Diaz Morales' detention has been very difficult for his children. The strain has been mitigated by their ability to visit him at Farmville Detention Center, where he has been held. Like many parents detained by ICE, Mr. Diaz Morales discovered only indirectly that he would be imminently transferred out of Virginia and would thus no longer be able to visit with his children while in detention. Mr. Diaz Morales filed this suit and was subsequently able to arrange an agreement whereby he would remain in Virginia at least for the time being. Most detained parents are not so lucky.

As a regular practice, Immigration and Customs Enforcement ("ICE") transfers detainees between its detention centers with little or no prior notice to the detainee or the detainee's family members. Detention centers are located throughout the country, and often in remote or inaccessible locations. This practice divides families, and fundamentally interferes with the parent-child relationship by making visitation extremely difficult if not impossible. The Fourth Circuit has declared that "perhaps the oldest of the fundamental liberty interests recognized by the Supreme Court [is] the interest of parents in the care, custody and control of their children" and the reciprocal right children enjoy to be "raised and nurtured" by their parents. *D.B. v. Cardall*, 826 F.3d 721, 704 (4th Cir. 2016) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)

(plurality opinion)); *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994) (the "sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution"); *see also, Wooley v. City of Baton Rouge*, 211 F.3d 913, 923 (5th Cir. 2000) (the relationship between mother and son is constitutionally protected and "a child's right to family integrity is concomitant to that of a parent"). The right to family unity is therefore both a fundamental constitutional right, and one that is held by both parent and child.

Longstanding Supreme Court precedent establishes that when a government action deprives an individual of a fundamental constitutional interest, that individual is entitled to due process consisting of notice and an opportunity to be heard. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 746 (1987), citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) ("When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. This requirement has traditionally been referred to as 'procedural' due process."). Citizens and non-citizens, immigrants and non-immigrants, children and adults possess due process rights. *See Demore v. Kim*, 538 U.S. 510, 549 (2003) (holding that procedural due process requirements apply to immigrants in removal proceedings). When a parent is placed in civil immigration detention at great distance from his or her child, the government has interfered with the parent's and the child's fundamental interest in family unity and must provide some amount of due process to ensure that the deprivation is fair.

Plaintiffs are *not* seeking to prevent ICE from deporting parents of noncitizens who are otherwise lawfully deportable; nor to prevent ICE from detaining parents of noncitizens who are otherwise lawfully detainable; nor to even to categorically prevent ICE from moving its detainees from one state to another. Plaintiffs merely seek to require ICE to afford constitutionally sufficient due process weighing the sanctified relationship between a U.S. citizen

child and a parent detainee against the government's interest in transferring the parent detainee.

Plaintiffs do not seek to design or prescribe what that process should look like, beyond giving

parent detainees and their U.S. citizen children notice and a meaningful opportunity to be heard

prior to ICE taking a decision as to whether to move any particular detainee from one state to

another.

## II.   **Factual Background**

### a.   **The Common Practice of Transferring Detainees to States Away from their Family Without Meaningful Notice or an Opportunity to Be Heard.**

ICE routinely places and transfers non-Salvadoran ICE detainees[1] throughout the country,

with little or no transparency about when transfers will occur, who will be affected, or where

detainees will be sent. *See generally*, Ex. 1, ICE Policy 11022.1. The ICE transfer policy

establishes that

> "Unless a transfer is deemed necessary by a [Field Office Director] or his or her designee[2]…ICE Supervisory Immigration Officer(s) *will not* transfer a detainee when there is documentation to support the following:

---

[1] There are additional limitations on transferring Salvadoran detainees under *Orantes-Hernandez v. Gonzales*, No. 82-01107, Modified Consolidated Injunction (C.D. Cal. Nov. 26, 2007).

[2] The Field Office Director or designee is given great latitude in deeming a transfer necessary, including for "convenience of the agency." Ex. 1 at 5.3(3)(d). The reasons for deeming a transfer necessary are:

> "a) To provide appropriate medical or mental health care to the detainee.
> b) To fulfill an approved transfer request by the detainee.
> c) For the safety and security of the detainee, other detainees, detention personnel or any ICE employee.
> d) At ICE's discretion, for the convenience of the agency when the venue of EOIR proceedings is different than the venue in which the alien is detained.
> e) To transfer to a more appropriate detention facility based on the detainee's individual circumstances and risk factors.
> f) Termination of facility use due to failure to meet ICE detention standards, lack of sufficient use of the facility by ICE, or emergent situations.
> g) To relieve or prevent facility overcrowding; in such cases, efforts should first be made to identify for transfer those detainees who do not meet any of the criteria listed in section 5.2(1)."

a) Immediate family within the [Area of Responsibility];

b) An attorney of record (Form G-28, *Notice of Entry of Appearance as Attorney or Accredited Representative* on file) within the AOR;

c) Pending or on-going removal proceedings, where notification of such proceedings has been given, within the AOR; or

d) Been granted bond or has been scheduled for a bond hearing.

*Id.* at §5.2. ICE's policy on "Facilitating Parental Interests in the Course of Civil Immigration and Enforcement Activities" directs officers not to place a parent detainee outside of the Field Office's area of responsibility if that detainee has a child in the same geographic area, subject to ICE's discretion as outlined it its transfer policy. Ex. 2, ICE Policy 11064.1. Nonetheless, such detainees are frequently transferred with no notice to their families or attorneys. Declaration of Eileen Blessenger, Ex. 3 at ¶¶6-11. In Plaintiff Macario Diaz Morales' case, he was scheduled to be transferred despite having four U.S. citizen children, an attorney of record in Virginia, and a bond hearing scheduled in the Arlington Immigration Court. Declaration of Areli Vega Reyna, Ex. 4 at ¶¶3, 6, 15-17; Ex. 5, Notice of Hearing for Custody Redetermination. ICE did not provide any notice to Mr. Diaz Morales, his attorney, or his family about his impending transfer. Ex. 4 at ¶15-16.

Per ICE policy, detainees themselves are only required to be notified "immediately prior to transfer" that they will be moved to another facility, and may not make or receive telephone calls until they reach their destination. Ex. 1 at §5.3(3). Thus, the detainee receives no meaningful notice of transfer nor are they able themselves to notify their family or attorney of

---

Ex. 1 at §5.3(3). These reasons essentially establish that if ICE *itself* claims either specific needs on behalf of detainees or risks posed by a detainee, or if ICE has any administrative interest in transferring detainees, it may deem a transfer "necessary." While the policy gives a nod to the existence of some interest in family unity by encouraging "efforts" to avoid moving parents, it does not, in policy or in practice, afford constitutionally required due process weighing that interest against the government's interest in transferring a detainee.

their impending transfer. Attorneys of record are to be notified of a transfer "as soon as practicable on the day of the transfer, but in no circumstances later than twenty-four (24) hours *after* the transfer occurs." Ex. 1 at §5.3(2)(a) (emphasis added).  Per its own policy, "ICE is not required to notify family members or [non-attorney of record] third parties of a transfer." *Id.* at § 5.3.

### b. The Transfer of Parents Without Notice and the Opportunity to be Heard Denied Detained Parents and their U.S. Citizen Children of their Right to Family Unity Without Due Process of Law

The right of a parent to maintain a relationship with their children, and their children's concomitant right to the love and care of their parents, are "sacrosanct." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994); *see also, Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (due process protects children against being dislocated from the emotional attachments that derive from the intimacy of daily association with parents). The Fourth Circuit has declared, "the forced separation of parent from child, even for a short time, represents a serious impingement on [parental] rights." *Jordan,* 15 F.3d at 346. This right of family unity, held by both parent and child, is a long-standing and widely accepted fundamental constitutional right. *Cardall*, 826 F.3d at 704; s*ee also, Hodge*, 31 F.3d at 163; *Wooley*, 211 F.3d at 923. Thus, when a parent is transferred away from his or her child, both the parent's right to family unity and the child's right to family unity is at stake.

The cornerstone of due process is meaningful notice and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306 (1950). In *Weller v. Department of Social Services for City of Baltimore,* the Fourth Circuit held that "the onus must be on the government, once it has decided to withhold a child from a parent's care, to justify its actions." 901 F.2d 387, 396 (4th Cir. 1990). *See also Stanley*, 405 U.S. at 658 (procedures that

"insist[] on presuming rather than proving" are insufficient under the Due Process Clause). In

addition, the Supreme Court held in *Marshall v. Jerico*, 446 U.S. 238, 242 (1980),

> The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. (Internal citations omitted.)

When ICE transfers detainees, they are "transferred far from their homes" making

contact with their children difficult or impossible. Applied Research Center, *Shattered

Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare

System*, 38 (2011), *available at* https://www.raceforward.org/research/reports/shattered-

families. In 2011, detainees were "transported an average of 370 miles from the place of

their initial detention" and many were moved farther. *Id.* Recognizing the importance of

family relationships, ICE has established, at least on paper, a preference for preserving

the ability of parents to have face-to-face visitation with their U.S. citizen children. *See*

Ex. 2. It follows that when a parent detainee is transferred away from his or her children,

ICE recognizes that the transfer occurs to the detriment of the detainee and the child's

fundamental right to family unity. Ms. Vega Reyna understands that Mr. Diaz Morales

was about to be sent to a detention center in Texas, along with approximately 150 other

detainees, where it would have been impossible for them to visit their father. Ex. 4 at

¶¶15-17.

Further, in ICE's determinations as to whether to transfer a detainee, no due

process is afforded to detainee or child with respect to a transfer decision. As described

above, a detainee's child or children are not notified in advance of a detainee's transfer.

*See* Ex. 1. at §5.3. The detainee him- or herself is only provided notice immediately prior to transfer, which is largely meaningless for the purposes of due process because it affords no time to respond. *Id.* In fact, per ICE policy, the detainee is specifically not allowed to call or communicate with his family after receiving the information regarding his impending transfer. *Id.* at §5.3(3). Therefore neither the detainee nor the U.S. citizen children receive meaningful notice of the detainee-parents' transfer.

Aside from no meaningful notice, there is also no opportunity to be heard. The decision to transfer a detainee parent has already been made once that detainee learns of his or her transfer. He or she has no opportunity to present further information or argument. Because there is no notice to the detainee's family, the children of detainees obviously have no opportunity to participate in the decision in any way.[3] With respect to preserving the limited family unity that is afforded when a parent is detained by ICE, there is absolutely no due process given to either the detainee parent or the U.S. citizen child, despite the weighty constitutional interests of both parent and child.

### *Macario Diaz Diaz Morales*

Mr. Diaz Morales is a 37-year-old man living in Alexandria, Virginia. He is currently detained by the United States Department of Homeland Security (DHS) and is incarcerated at the Farmville Detention Center at 508 Waterworks Road, Farmville, VA 23901. On the morning of

---

[3] Plaintiffs are certainly not proposing that in-person hearings are required. The Supreme Court recognized that "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Thus, to determine whether administrative procedures are constitutionally sufficient requires an examination of the governmental interests, including "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). Nonetheless, due process is ultimately required in some form when the government interferes with a fundamental constitutional right. U.S. Const. amend. V.

September 13, 2017, ICE agents arrived at Mr. Diaz Morales' home and detained him. Ex. 4 at ¶4. He has been detained at Farmville Detention Center since that date.

Mr. Diaz Morales is the father of four minor U.S. citizen children who live in Alexandria, Virginia. Ex. 6, Redacted Birth Certificates of Minor Plaintiffs. His two older minor children are step children whom he has cared for since 2006 when he met their mother. Ex. 4 at ¶¶3, 7. One of them, J.F.G., has autism[4] which requires him to be completely dependent on his parents for support. Mr. Diaz Morales is a loving and committed father who spends his free time with his family, and who has strong bonds with each of his children. *Id.* at ¶¶8- 13. His children have visited him four times since his initial detention with their mother, and plan to continue visiting him, as it eases the pain of his separation and allows them to maintain their relationship. *Id.* at ¶14.

On October 20, 2017, Mr. Diaz Morales discovered that his commissary account at Farmville Detention Center had been closed. *Id.* at ¶15. He immediately contacted his wife, who informed his attorney. *Id.* They suspected that his account closure indicated that he would imminently be transferred out of Virginia to another detention facility. *Id.* Despite his and his attorney's efforts, he was unable to obtain information about whether he would be transported and to where. *Id.* Neither his wife, children, or attorney were ever notified of his pending transfer. *Id.* at ¶¶15-17. After filing a complaint and motion for a temporary restraining order, ICE agreed to voluntarily halt his transfer for the time being, in order to obviate the need for a ruling on the TRO. *See* ECF Docket No. 6. Mr. Diaz Morales remains at Farmville Detention Center at least until his upcoming bond hearing on October 31, 2017, in Arlington, Virginia.

---

[4] The initial complaint in this action erroneously states that J.F.G. was a child with Down's Syndrome. He does not have Down's Syndrome, but is a child with autism.

### *J.F.G.*

J.F.G. is the 17-year old step-son of Mr. Diaz Morales. He lives in Alexandria, Virginia with his mother, siblings, and father prior to his father's detention. Ex. 4 at ¶¶2-3. He is a child with disabilities and is autistic. *Id.* at ¶¶3, 13. He has a very close relationship with Mr. Diaz Morales and has had episodes of crying and calling for him since he was detained. *Id.* at ¶13. His first visit to see his stepfather on Sunday, October 22, 2017 was an emotional one. *Id.* He presented a necklace with a cross on it that he had made himself as a gift for his step-father. Mr. Diaz Morales, with tears in his eyes, explained that he was not allowed to keep it with him in detention, so J.F.G. would have to hold it for him. *Id.* J.F.G. has been wearing it and holding it since that visit and says that it protects Mr. Diaz Morales and the whole family. *Id.* His visits with his step-father has made a noticeable and positive difference in his willingness to engage with his mother and siblings, and in his overall demeanor. *Id.*

### *K.G.*

K.G. is the 16-year-old son of Mr. Diaz Morales. He lives in Alexandria Virginia with his mother, siblings, and father prior to his father's detention. Ex. 4 at ¶3, 10. His biological father was largely absent from his life, and when his father met his mother, he stepped in as a caregiver, father figure, and male role model. *Id.* at ¶7. They have a close and loving relationship. Mr. Diaz Morales often takes K.G. with his siblings on walks or hikes on the weekend. *Id.* at ¶10. He and K.G. have a playful relationship. *Id.* He has visited his father in detention four times since he was detained. *Id.* at ¶14. These visits have been essential to Mr. Diaz Morales' and K.B.'s parent-child relationship during Mr. Diaz Morales' detention.

### J.D.V.

J.D.V. is the ten-year-old U.S. citizen son of Mr. Diaz Morales. He lives in Alexandria, Virginia with his mother, siblings, and father prior to his father's detention. *Id.* at ¶3. J.D.V. has a close and loving relationship with his father. *Id.* at ¶11. J.D.V. misses his father intensely and goes to sleep holding a picture of him every night. *Id.* He has visited his father four times since his father was detained. *Id.* at ¶14. These visits have been very important to Mr. Diaz Morales and to J.D.V., and have allowed them to maintain a close relationship despite Mr. Diaz Morales' detention.

### J.D.V.

J.D.B. is the nine-year-old son U.S. citizen of Mr. Diaz Morales. He lives in Alexandria, Virginia with his mother, siblings, and father prior to his father's detention. *Id.* at ¶3. He has had a close relationship with his father his entire life. His father has had an active and nurturing role in his upbringing. *Id.* at ¶12. J.D.B loves his father and struggles with his current absence. *Id.* Like his brother, J.D.V. sleeps holding a picture of his father every night. *Id.* He has visited his father four times since his father was detained. *Id.* at ¶14. These visits, at the very least, allow J.D.V. and his father to be physically and emotionally connected.

### III.   <u>Argument</u>

The decision to certify a class must occur "[a]t an early practicable time after a person sues or is sued as a class representative."  Fed. R. Civ. P. 23(c)(1)(A).  To be certified as a class action, Plaintiffs must satisfy the requirements of Rule 23(a) as well as the additional requirements of one of three categories of class actions, Rule 23(b)(1), (b)(2), or (b)(3). Rule 23(a) has four requirements:

> (1) "the class is so numerous that joinder of all members is impracticable,"

(2) "there are questions of law or fact common to the class,"
(3) "the claims or defenses of the representative parties are typical
of the claims or defenses of the class," and
(4) "the representative parties will fairly and adequately protect the
interests of the class."

Fed. R. Civ. P. 23(a)(1)-(4).  Plaintiff must also satisfy the requirements of one of the three types

of class actions under Rule 23(b).  *See Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th

Cir. 2004). A class action may be maintained pursuant to Rule 23(b)(2) when "the party

opposing the class has acted or refused to act on grounds that apply generally to the class, so that

final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole." Fed. R. Civ. P. 23(b)(2).

    "If a lawsuit meets these requirements, certification as a class action serves important

public purposes."  *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003).  As a

result, "federal courts should give Rule 23 a liberal rather than a restrictive construction,

adopting a standard of flexibility in application which will in the particular case best serve the

ends of justice for the affected parties and . . . promote judicial efficiency." *Id.* (internal

quotation omitted).

    As discussed in greater detail below, Plaintiffs easily satisfy the requirements of Rule

23(a).  Moreover, Plaintiffs' request for relief is appropriate for certification under Rule 23(b)(2).

    **A.**    **Plaintiffs Satisfy Rule 23(a)'s Requirements.**

        1.   The Classes Are Sufficiently Defined.

In addition to the four express requirements of Rule 23(a), Rule 23 has an implicit

"ascertainability" requirement.  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) ("We

have repeatedly recognized that Rule 23 contains an implicit threshold requirement that the

members of a proposed class be 'readily identifiable'").

While the Fourth Circuit has not explicitly addressed the question, the vast majority of courts have held that that this requirement does not apply to Rule 23(b)(2) class actions seeking injunctive relief. *See, e.g.*, *Shelton v. Bledsoe,* 775 F.3d 554, 561 (3d Cir. 2015) ("Because the focus in a (b)(2) class is more heavily placed on the nature of the remedy sought, and because a remedy obtained by one member will naturally affect the others, the identities of individual class members are less critical in a (b)(2) action than in a (b)(3) action.). Since Rule 23(b)(2) class actions are mandatory, there is less need for individualized notice, no individualized distribution of relief, and no opportunity to opt out—the usual justifications for the ascertainability requirement. *See, e.g., Shelton,* 775 F.3d at 561 (ready identification of class members serves several important objectives that either do not exist or are not compelling in (b)(2) classes); *see also In re Allstate Ins. Co.*, 400 F.3d 505, 506 (7th Cir. 2005) ("A Rule 23(b)(2) class action does not require giving class members notice of the suit and a chance to opt out of it and bring their own, individual suits; a Rule 23(b)(3) class action does. The thinking behind this distinction is that declaratory or injunctive relief will usually have the same effect on all the members of the class as individual suits would.").

Here, Plaintiffs seek injunctive relief: an order requiring the Defendants to stop its current policy and practice of transferring parent-detainees with U.S. citizen children to facilities out of state without affording parents and children proper notice and opportunity to be heard. As a result, the precision required for a damages class is not required here. Plaintiffs' classes are sufficiently defined to allow the Court to determine its existence, and make the necessary findings under Rules 23(a) and (b). *See Cole v. City of Memphis*, 2015 U.S. Dist. LEXIS 68909 (W.D. Tenn. May 28, 2015) (civil rights class sufficiently ascertainable when "limited to those

individuals who are injured as a result of government action that was not 'narrowly tailored to a compelling government interest.'").

Further, each class is ascertainable. ICE ask detainees whether they have U.S. citizen children "as part of their regular booking process" and record it in each detainee's file. Ex. 3 at ¶12. Per ICE's policy, an "Immigration Officer will conduct a review to determine whether [the detainee has immediate family within the Area of Responsibility]." Ex. 2 at §5.2(2). Once ICE determines that a detainee is the parent or guardian of a U.S. citizen, that information is entered into ICE's internal information management system, called ENFORCE. Ex 2 at §5.2(2).

2.   The Classes Are Sufficiently Numerous

To certify a class, a court must find that it is "is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "No specified number is needed to maintain a class action under Fed. R. Civ. P. 23; [rather], application of the rule is to be considered in light of the particular circumstances of the case[.]" *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (finding that a class of 18 was sufficient to fulfill the numerosity requirement under circumstances); *see also Dashiell v. Van Ru Credit Corp*., No. 1:12-cv-273 2012 U.S. Dist. LEXIS 104043, *7 (E.D. Va. July 23, 2012) (65 class members enough to meet numerosity requirement).

Here, there are too many detained parents to join in a single action.  The two primary ICE detention facilities in Virginia are ICA-Farmville, where plaintiff Mr. Diaz Morales is currently detained, and Virginia Peninsula Regional Jail. Ex. 3 at n.1. From October 2014 through September 2015, the most recent period for which data is available, 1,884 detainees out of an overall annual population of 2,900 detainees were transferred to other ICE facilities from ICA Farmville. *Transfers of ICE Detainees from the Farmville Detention Center – Ica*, TRAC Immigration, http://trac.syr.edu/immigration/detention/201509/FRMVLVA/tran/ (last visited Oct.

30,2017). ICA-Farmville ranks in the top 11 percent nationwide "in the number of individuals transferred to other ICE facilities." *Id.* At Virginia Peninsula Regional Jail during the same period, 384 people were detained, and almost all of them, 336, were transferred to other ICE detention facilities. *Transfers of ICE Detainees from the Virginia Peninsula Regional Jail*, TRAC Immigration, http://trac.syr.edu/immigration/detention/201509/VPREGVA/tran/ (last visited Oct. 30, 2017). Virginia Peninsula Regional Jail ranks in the top 35 percent of ICE detention centers nationwide for detainee transfers. *Id.* A total of 2,549 ICE detainees in Virginia were transferred from ICE detention centers between October 2014 and September 2015. *Detention Facility Reports: Transfers*, TRAC Immigration, http://trac.syr.edu/cgi-bin/detention.pl?stat_type=tran&stat_type=tran&reptime=201509&sortcol=facility_name&sortdir=asc&facility_type=&facility_state=VA&facility_name=%28Enter+any+part+of+facility+name%29&stat_timebucket=3_last12&stat_lower=1&stat_upper=40000&submit=Update+List (last visited Oct. 30, 2017).

These numbers have likely risen over the course of this year. Nationwide, ICE arrests have increased by 43 percent under the current federal administration. Nick Miroff, *Deportations slow under Trump despite increase in arrests by ICE*, The Washington Post (Sept. 28, 2017), https://www.washingtonpost.com/world/national-security/deportations-fall-under-trump-despite-increase-in-arrests-by-ice/2017/09/28/1648d4ee-a3ba-11e7-8c37-e1d99ad6aa22_story.html?utm_term=.e75086b0b0ed. The greatest increase has been arrests of immigrants who have no criminal charges. *Id.* It is therefore becoming even more likely that parents of U.S. citizen children will be detained and placed in removal proceedings. *Id.*; *see also* Amy Taxin, *ICE: More immigrants arrested, fewer deported under Trump*, Chicago Tribune (May 17, 2017), http://www.chicagotribune.com/news/immigration/ct-trump-immigrants-

arrested-deported-numbers-20170517-story.html; Aria Bendix, *Immigration Arrests Are Up, but Deportation Is Down*, The Atlantic (May 17, 2017), https://www.theatlantic.com/news/archive/2017/05/under-trump-immigrants-arrests-are-up-but-deportation-is-down/527103/. This administration has explicitly stated that it seeks to detain and deport all undocumented immigrants, whether or not they have been convicted of a serious crime. *Id.* There are therefore an even greater number of Virginians who are at risk of being detained by ICE who have not yet been detained. In 2014, there were approximately 272,000 undocumented immigrants in Virginia, three quarters of whom have lived in the United States for over five years. *Virginia Immigrants in the Economy*, The Commonwealth Institute (April 19, 2017), http://www.thecommonwealthinstitute.org/2017/04/19/virginia-immigrants-in-the-economy/. As people who have lived in the United States for a significant length of time, it is likely that many undocumented immigrants have started families since arriving in the U.S. and have U.S. citizen children.

Similarly, there are too many U.S. citizen children with a detained parent to join their claims into a single action. While no public data exists regarding how many ICE detainees are parents of U.S. citizen children, the general population of children living with undocumented parents sheds light on the potential size of this second plaintiff class. Five percent of children in Virginia, almost 100,000 children in total, are U.S. citizens living with at least one undocumented family member. American Immigration Council, *Immigrants in Virginia* (2017), *available at* https://www.americanimmigrationcouncil.org/sites/default/files/research/immigrants_in_virginia.pdf. Therefore, nearly 100,000 U.S. citizen children living in Virginia have a parent who is at risk of arrest and detention by ICE. Because every person who is detained pending removal

proceedings is at risk for transfer outside of Virginia, the class of U.S. citizen children who have a detained parent at risk of transfer is certainly numerous and too large to join individual claims. The wide-reaching impact of ICE's policy of transferring detainees out of Virginia therefore meets the numerosity requirements.

3. Because Plaintiffs' Claims Derive from Defendant's Common Practice, They Meet the Commonality Requirement.

A court must also find that "there are questions of law or fact common to the class." Fed. R. Civ. P. Rule 23(a)(2). "A single common question will suffice, but it must be of such a nature that its determination will resolve an issue that is central to the validity of each one of the claims in one stroke." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (internal quotations & citations omitted); *see also Plotnick v. Computer Sci. Corp. Deferred Comp. Plan for Key Executives,* 182 F. Supp. 3d 573, 582 (E.D. Va. 2016) (commonality "is satisfied when there is even a single common question that will resolve an issue central to the validity of each of the class member's claims"). "Minor differences in the underlying facts of individual class members cases do not defeat a showing of commonality where there are common questions of law." *DiFelice v. U.S. Airways, Inc*., 235 F.R.D. 70, 78 (E.D. Va. 2006).

Here, the overarching legal question is: does the Defendants' uniform practice of transferring the parents of U.S. citizen children to out-of-state detention facilities, without giving them notice and an opportunity to be heard, violate the U.S. Constitution?

There are no material factual variations that would impede the common resolution of this central question.[5] Accordingly, the U.S. government takes the position that no such right exists

---

[5] To the extent that there are variations among plaintiffs, such as custody or visitation orders by a juvenile court, findings of abuse or neglect, child support payment arrangements, or other distinct family situations, they do not defeat class certification. To the contrary, the existence of various family situations is precisely why ICE must provide an opportunity for parents and

and maintains no procedures by which any class members could seek to exert such a right. *See generally*, Ex. 1.  The transfer process as outlined by ICE policy provides no notice to either parent or child, and affords no opportunity to parent or child to present their opinions or individualized information about their family. *Id.* It follows that there is no opportunity to adequately weigh the competing interests in transferring a given detainee. *Id.*

This policy presents a common question and would be resolved with a single, common resolution. This policy of depriving detainees and their children of their rights to family unity through parent-child visitation without providing either with notice or opportunity to defend one's interests, clearly raises a common question about the constitutionality of ICE's practice. Every one of the class members is equally subjected to the same ICE policy of no notice transfer of themselves or their parent. *Manuel v. Wells Fargo Bank, N.A.*, No. 3:14CV238, 2015 U.S. Dist. LEXIS 109780, *24 (E.D. Va. Aug. 19, 2015) (finding commonality where "[a]ll class members will have been subjected to this practice").  Moreover, resolving the question of whether this process violates Plaintiffs' due process rights is central to the lawsuit: if resolved for Plaintiffs, it establishes the need to cease the practice and institute a process for notice and opportunity to be heard; if resolved against the Plaintiffs, it upholds the policy as it currently exists.

4.  <u>Plaintiffs' Claims Are Typical of the Claims of Each Plaintiff Class.</u>

"The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998).  Put another way, the "representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class

children to be heard (not just simply take note their existence) before making a decision regarding transfer of a parent-detainee.

members. For that essential reason, plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006).

While some of their personal details differ, in this case, Plaintiffs' claims are straightforward and identical: each parent-detainee, detained pending removal proceedings, was or would be harmed by being transferred out of Virginia with no notice or opportunity to be heard; each U.S. citizen child of a detained parent was or would be harmed if his or her detained parent was transferred out of Virginia without any notice to the child or opportunity to be heard. These are the same claims each absent class member would assert.

The evidence each named plaintiff will offer to prove his or her claim is also identical to those the class would proffer.  Each named parent plaintiff will show:

- That he or she is detained by ICE in Virginia under authority of 8 U.S.C. § 1226, and is thus detained pending removal proceedings;

- That he or she is the parent of a U.S. citizen child living in Virginia;

- That he or she did not receive  notice of his or her transfer at all or until the transfer decision was imminent;

- That if he or she was transferred, communication with family or attorneys was forbidden until he or she arrived at the destination detention center; and

- That he or she had no opportunity to be heard from ICE prior to orders to transfer or transfer to an out-of-state facility of his or her self or his or her parent.

Each child plaintiff will show:

- That he or she lives in Virginia and is the U.S. citizen child of a parent detained by ICE in Virginia;

- That his or her parent is detained by ICE pursuant to 8 U.S.C. § 1226 and therefore has pending removal proceedings in immigration court;

- That he or she received no notice of his or her parents' imminent transfer out of Virginia;

- That he or she had no opportunity to present information or argument to ICE or any other authority regarding a parent's transfer.

There may be minor variations in the proof the Plaintiffs will offer: for example, some may have been deduced that they were being transferred when their commissary account was closed, and thus notified their family and/or attorneys. The happenstance of such notice, however, certainly does not rise to the level of constitutionally sufficient notice or adequate opportunity to be heard. As such, those minor variations do not affect the essential elements of their due process claims, and thus do not render them atypical. *See In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006) ("[T]he mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification.").[6]

The relief the named plaintiffs seek is identical as well.  Each class member in both classes will benefit from the injunctions the named plaintiffs seek (1) prohibiting the transfer of themselves or a parent to an out-of-state detention facility without due process (2) declaration that defendants' policy and practice of transferring detainees with children away from their children without adequate notice or an opportunity to be heard is unlawful.

5. <u>Plaintiffs Will Adequately Represent the Interests of the Classes</u>

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This standard is met if "the named plaintiff has interests common with, and not antagonistic to, the [c]lass' interests…." *Milbourne v. JRK Residential Am., LLC*, No. 3:12CV861, 2014 WL 5529731, at *8 (E.D. Va.

---

[6] Likewise, the fact that Mr. Diaz Morales may be out of detention on bond by the time this Motion is heard, does not defeat typicality.  First, as stated below, claims of this nature are always "inherently transitory," as discussed below; this does not defeat typicality, but rather provides further reason why class certification is warranted.  Second, any individual released from ICE detention on bond is subject to re-detention at any time at ICE's sole discretion. *See* 8 C.F.R. 1236.1(c)(9).

Oct. 31, 2014) (quoting *In re Se. Hotel Props. Ltd. P'ship Investor Litig.,* 151 F.R.D. 597, 606–07 (W.D.N.C.1993)). For this reason, the "adequacy-of-representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a)." *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 626 (1997) (internal quotation omitted).

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id*. at 625.  A minor conflict is insufficient to cause the representatives to be deemed inadequate.  "For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.'"  *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (quoting *Gunnells*, 348 F.3d at 430). "A conflict is not fundamental when . . . all class members share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants]." *Id.* at 180 (internal quotation marks omitted; alterations in original).  Any purported conflict must be real, not speculative or hypothetical.  *Id.*

In this case, the representative Plaintiffs do not have *any* conflict—let alone a fundamental one—with the other members of the class. The injunctive and declaratory relief they seek will benefit the entire class in the same manner—preventing the unconstitutional deprivation of their substantive and procedural due process rights to family unity. Furthermore, as Ms. Vega Reyna's declaration states, the representative Plaintiffs have been in close communication with their attorneys at each step of the litigation. Ex. 4 at ¶¶6, 15-17. They are knowledgeable about the facts, the litigation, and the legal obstacles the Class will face, and are dedicated to actively participating in the litigation on behalf of all Virginia's residents who may be themselves or their parents be transferred to an out-of-state detention facility without due process. "Only if the class representatives' 'participation is so minimal that they virtually have abdicated to their attorneys

the conduct of the case' should they fail to meet the adequacy of representation requirement.'"

*Morris v. Wachovia Sec., Inc.*, 223 F.R.D. 284, 296 (E.D. Va. 2004) (quoting *Kirkpatrick v. J.C.*

*Bradford & Co.*, 827 F.2d 718, 728 (11th Cir. 1987)).  This is not the case here.

Plaintiffs have met their initial burden to demonstrate adequacy of representation, and

absent any evidence to the contrary, the Court must thus presume the adequacy requirement has

been satisfied. 3 *Newberg on Class Actions* at § 7.24.

### 7. Class Counsel Is Adequate under Rule 23(g)

"The adequacy [requirement] also factors in competency and conflicts of class counsel."

*Amchem*, 521 U.S. at 626 n.20.  Class counsel in this case easily meet the adequacy requirement

of Rule 23.  "The adequacy of counsel prong of Rule 23(a)(4) asks whether counsel are qualified,

experienced and generally able to conduct the litigation and whether counsel will vigorously

prosecute the interests of the class."  Newberg on Class Actions § 3:72 (5th ed.)  "[M]embers of

the bar in good standing typically [are] deemed qualified and competent to represent a class

absent evidence to the contrary."  *Id.*  Similarly, under Rule 23(g), the Court must consider (1)

"the work counsel has done in  identifying or investigating potential claims in the action," (2)

"counsel's experience in handling  class actions, other complex litigation, and the types of claims

asserted in the action," (3)  "counsel's knowledge of the applicable law," and (4) the resources

that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Here, Plaintiffs are represented by well-known and seasoned attorneys from the Legal Aid

Justice Center.  This organization, and the counsel involved in this case, have extensive

experience litigating  complex matters and class actions, including class actions involving matters

of federal  constitutional law, and all have significant experience litigating on behalf of indigent

individuals seeking legal recognition of their civil rights, including at the  local, state, and federal

levels.  *See* Declaration of Rebecca Wolozin, Ex. 7, at ¶¶ 3-5; Declaration of Simon Sandoval-Moshenberg, Ex. 8, at ¶¶ 5-8; Declaration of Angela Ciolfi, Ex. 9, at ¶¶7-13; Declaration of Sophia Gregg, Ex. 10, at ¶¶3. Counsel are committed to vigorously prosecuting the claims on behalf of the class.

      **B.**      <u>Plaintiffs Satisfy the Requirements of Rule 23(b)(2).</u>

Certification is appropriate under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Rule 23(b)(2)'s is designed to ensure that large, dispersed groups can still effectively challenge illegal practices or policies.  As the Advisory Committee noted when drafting this subsection, it is

> intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. Declaratory relief 'corresponds' to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief . . . Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.

*Id.,* Advisory Committee notes to 1966 Amendment.  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them,'" *Wal-Mart v. Dukes* 131 S.Ct. 2541, 2557 (2011) (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Given the reach and intent of Rule 23(b)(2), the Supreme Court has noted that certification under this section is particularly appropriate in "[c]ivil rights cases against parties charged with unlawful, class-based discrimination." *Amchem Products, Inc. et al. v. Windsor, et al.,* 521 U.S.591 at 614 (1996); *see also Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 329-30 & 330 n.24 (4th Cir. 2006) ("Rule 23(b)(2) was created to facilitate civil rights class actions.") (citing 7AA Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 1775 (3d ed. 2005)).

This case presents  exactly the type of civil rights action Rule 23(b)(2) was created to foster. Plaintiffs have brought this case seeking a declaration that Defendant's uniform practice of automatically transferring detainees to out-of-state detention facilities without notice or any opportunity for a hearing is unconstitutional because it violates due process and fundamental fairness, under the Fifth Amendment.  To remedy this violation, plaintiffs seek an injunction requiring the Defendant to cease its unconstitutional policy and practice of transferring detainees with children away from their children without adequate notice or an opportunity to be heard afforded to both parent detainee and child. This relief—both the declaration and the corresponding injunction—would benefit *all* members of the class.  Under circumstances like these, where the plaintiffs seek a declaration that a practice is unconstitutional and an injunction ceasing the practice, courts frequently certify classes pursuant to Rule 23(b)(2).  *See, e.g.*, *V.W. v. Conway,* 2017 U.S. Dist. LEXIS 24395, *35 (N.D.N.Y., Feb. 22, 2017) (certifying Rule 23(b)(2) class challenging constitutionality of solitary confinement for juveniles because "the members of the class … would benefit from the same remedy—an order enjoining defendants from the application of the policies and practices resulting in the deprivations at issue"); *Disability Law Ctr. v. Utah,* 2016 U.S. Dist. LEXIS 132653 (D. Utah, Sep. 27, 2016) (certifying Rule 23(b)(2)

class challenging constitutionality of treatment of incompetent defendants because "proposed class members' injuries are amply similar that they can be remedied through an injunction that does not differentiate between Plaintiffs or proposed class members").

### C. Plaintiff's Claims are Inherently Transitory

It is further appropriate to certify this class at this stage of litigation because each individual plaintiff's claim is inherently transitory, thus making it difficult to litigate violations of constitutional rights on an individual basis. A case where claims may be mooted before a Plaintiff can even be granted class certification is precisely the type of claim for which class actions are most important. *See* Rubenstein, 1 Newberg on Class Actions § 2:10 (5th ed.). Thus, there is an "inherently transitory claim" exception to the mootness doctrine in the context of class actions. *See U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 399 (1980) ("some claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires"). The quintessential "inherently transitory" case is one where the named plaintiff files his claim while he is in government custody, and he is released from custody before the class can be certified. *See County of Riverside v. McLaughlin,* 500 U.S. 44, 51–52, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991) (citing *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)).

The basis of the "inherently transitory" exception is the "relating back" doctrine, viewing claims as live based upon the time of filing of the complaint containing class allegations. *Riverside,* 500 U.S. at 51–52 ("In such [inherently transitory] cases, the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution."; *see also*, *Geraghty,* 445 U.S. at 398–99 (noting the establishment of an exception for claims that are so inherently transitory that the trial court "will not have even enough time to rule on a motion for

class certification before the proposed representative's individual interest expires" and the use of

the "relation back" approach to accomplish certification prior to mootness (citing *Gerstein*, 420

U.S. at 110 n.11); *Swisher v. Brady,* 438 U.S. 204, 213 n.11 (1978) (noting how "relation back"

doctrine addresses the problem of the lengthy timeline of judicial review creating mootness

problems with respect to named plaintiffs in class cases (quoting *Sosna v. Iowa*, 419 U.S. 393,

402 n.11 (1975)) (internal quotation marks omitted); *Gerstein,* 420 U.S. at 110–11 n.11 (holding

that plaintiffs' claims fell under the exception for claims capable of repetition yet evading

review, but further noting that "[i]t is by no means certain that any given individual, named as

plaintiff, would be in pretrial custody long enough for a district judge to certify the class.

Moreover, in this case the constant existence of a class of persons suffering the deprivation is

certain"); *Sosna,* 419 U.S. at 402 n.11 (1975) ("There may be cases in which the controversy

involving the named plaintiffs is such that it becomes moot as to them before the district court

can reasonably be expected to rule on a certification motion. In such instances, whether the

certification can be said to 'relate back' to the filing of the complaint may depend upon the

circumstances of the particular case and especially the reality of the claim that otherwise the

issue would evade review."). Therefore, if the individual plaintiffs in the class may quickly

change, but the overall existence of a plaintiff population remains, the principal of "relating

back" for "inherently transitory claims" applies. District courts in the fourth circuit have applied

these principles. *See, e.g.*, *Shifflett v. Kozlowski*, No. CIV. A. 92-0072-H, 1993 WL 21465, at *4

(W.D. Va. Jan. 25, 1993); *Kensington Physical Therapy, Inc. v. Jackson Therapy Partners, LLC*,

974 F.Supp.2d 856 (S.D. MD. Oct. 2, 2013) (finding that the decision denying certification as

moot following settlement in *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66 (2013) did not

apply to Rule 23 class action cases). Although the fourth circuit itself has not addressed this

issue, several circuits have explicitly applied the principle of inherently transitory claims. *See*

*Olson v. Brown,* 594 F.3d 577, 583 (7th Cir. 2010), cert. denied (2010) ("When the claim is

inherently transitory, as it was in *Gerstein* and as it is in this case, the plaintiff must show that

there will likely be a constant class of persons suffering the deprivation complained of in the

complaint."); *Zurak v. Regan,* 550 F.2d 86, 91–92, 22 Fed. R. Serv. 2d 1344 (2d Cir. 1977)

("Because of the relatively short periods of incarceration involved and the possibility of

conditional release there was a significant possibility that any single named plaintiff would be

released prior to certification. . . As in *Gerstein*, however, the constant existence of a class of

persons suffering the alleged deprivation is certain and the court may safely assume that counsel

has other clients with a continuing live interest in the issues." (citing *Gerstein* 420 U.S. at 110–

11 n.11)).

For the purposes of class certification, this case is analogous to a case of pre-trial detention

or detention with the possibility of parole addressed in the foundational cases establishing a

mootness exception for inherently transitory claims discussed above. Here, ICE detainees are

held in federal custody pending their removal proceedings. Class members detained under 8

U.S.C. § 1226 may be eligible for bond following their initial detention. If granted bond, they

would no longer be detained and thus the government would no longer be interfering in their

right to family unity, at least temporarily. Federal regulations give ICE discretion to re-detain

these individuals at any time during their removal proceedings. *See* 8 C.F.R. 1236.1(c)(9).

Importantly, releasing a detainee and therefore mooting his or her individual case would not

prevent the universal practice of transferring parents great distances from their U.S. citizen

children pending their removal proceedings. The ongoing detention of immigrant parents of U.S.

citizen children establishes a continuing but shifting violation of detainees' and their children's

right to family unity.


IV.   **Conclusion**

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court

enter an order certifying two classes consisting of:

(3) All parents of U.S. citizen children residing in the Commonwealth of Virginia, who at
any time on or after October 20, 2017 are or were detained by U.S. Immigration and
Customs Enforcement within the Commonwealth of Virginia under the authority of 8
U.S.C. § 1226; and

(4) All U.S. citizen children residing in the Commonwealth of Virginia who, at any time
on or after October 20, 2017, have a parent detained within the Commonwealth of
Virginia by U.S. Immigration and Customs Enforcement under the authority of 8
U.S.C. § 1226.

Plaintiffs furthermore request that the Legal Aid Justice Center be appointed class

counsel for both classes.



Respectfully submitted,

LEGAL AID JUSTICE CENTER


By: _____/s/ Rebecca Ruth Wolozin_____          Date: 10/30/2017
Rebecca Ruth Wolozin (VSB No: 89690)
Simon Sandoval-Moshenberg (VSB No.: 70110)
Angela Ciolfi (VSB No.: 65337)
Sophia Gregg (VSB No.: 91582)
6066 Leesburg Pike #520
Falls Church, Virginia 22041
(703) 778-3450 / Fax: (703) 778-3454
becky@justice4all.org
simon@justice4all.org
angela@justice4all.org

sophia@justice4all.org
*Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2017, I electronically filed the foregoing

Memorandum of Law in Support of Plaintiffs' Motion for Class Certification with the Clerk of

Court using the CM/ECF System. A true and correct copy will be served upon each defendant

along with the summons and complaint in this action.  In addition, a true and correct copy was on

this date served by e-mail upon the following individuals:

> Dennis Barghaan
> U.S. Attorney's Office for the Eastern District of Virginia
> U.S. DEPARTMENT OF JUSTICE
> (DBarghaan@usa.doj.gov)
>
> Jeffrey Robbins
> Office of Immigration Litigation
> U.S. DEPARTMENT OF JUSTICE
> (Jeffrey.Robins@usdoj.gov)

> Respectfully submitted,
>
> Rebecca R. Wolozin, VSB No. 89690
> LEGAL AID JUSTICE CENTER
> 6066 Leesburg Pike, Suite 520
> Falls Church, VA 220041
> (becky@justice4all.org)
>  (703) 720-5606
>
> By: ___/s/ Rebecca R. Wolozin_____
> Attorneys for Plaintiffs